IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

BORING V. ZOETIS LLC

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

MARTIN BORING, APPELLEE,

V.

ZOETIS LLC, APPELLANT.

Filed December 8, 2020.    No. A-20-275.

Appeal from the Workers' Compensation Court: J. MICHAEL FITZGERALD, Judge. Affirmed in part, and in part reversed and vacated.

A. Francesca Romano and Eric T. Lanham, of McAnany, Van Cleave & Phillips, P.A., for appellant.

Ryan C. Holsten and Nolan J. Niehus, Senior Certified Law Student, of Atwood, Holsten, Brown, Deaver & Spier Law Firm, P.C., L.L.O., for appellee.

BISHOP, ARTERBURN, and WELCH, Judges.

WELCH, Judge.

## I. INTRODUCTION

Zoetis LLC appeals the determination of the Nebraska Workers' Compensation Court that (1) Martin Boring's right shoulder injury arose out of and in the course of his employment with Zoetis, (2) Boring is entitled to temporary and permanent benefits, (3) Boring is entitled to payment and/or reimbursement for past and future medical expenses as well as mileage, (4) Boring is entitled to a vocational rehabilitation evaluation, and (5) awarding penalties and attorney fees with interest. We affirm in part, and in part reverse and vacate the judgment of the Workers' Compensation Court.

- 1 -

## II. STATEMENT OF FACTS

Boring, born in June 1960, was employed by Zoetis in various roles, including as a maintenance technician from June 2004 to September 2017. On February 7, 2017, Boring alleged he suffered a right shoulder injury at Zoetis while lying on the floor to remove a gear box and motor, weighing over 40 pounds, from a tank. The specifics of the events surrounding Boring's subsequent complaints and treatment for his injury are provided in more detail in the following section. Boring eventually underwent two surgeries for his right shoulder in April 2018 and February 2019.

In October 2018, Boring filed a petition with the Workers' Compensation Court alleging, among other things, that on February 7, 2017, he was involved in an accident arising out of and in the course of his employment with Zoetis and sustained injuries to his right upper extremity and that he provided timely notice to Zoetis. Zoetis filed an answer in which it admitted the aforementioned allegations but acknowledged paragraph 5 of the complaint which set forth "[t]hat the matter or matters in dispute include the compensability of past, present, and future medical expenses, temporary disability and waiting time, interest and attorney's fees and, to the extent [Boring] has reached maximum medical improvement at the time of trial, permanent impairment benefits." Zoetis further denied Boring's allegation contained in paragraph 6 of the complaint:

> That no reasonable controversy exists concerning the compensability of [Boring's] claim, and yet, despite more than [a] thirty (day) notice of [Boring's] accident and injuries, [Zoetis] has failed and refused to make payment to [Boring] of compensable medical and mileage expenses and indemnity benefits, and [Boring] is therefore entitled to interest, costs, waiting time and attorney's fees in accord with Neb. Rev. Stat. § 48-125.

The matter was subsequently set for trial.

### 1. TRIAL

Trial was held in October 2019, during which the parties submitted trial stipulations including that as of February 7, 2017, Boring's average weekly wage was $1,468.31 for purposes of temporary and permanent impairment, and that Boring had reached maximum medical improvement concerning his right shoulder on July 1, 2019. The parties also stipulated:

> Should the Court find [Boring] suffered a compensable accident and injury, [Boring] would be entitled to an Award as follows:
>
> (a) [Boring] was temporarily totally disabled from 4/18/18 to 7/1/19, or 62 6/7 weeks at the statutory maximum $817.00 rate.
>
> (b) [Boring] suffered a 15 [percent] permanent partial impairment to his right shoulder,
>
> (c) [Boring] is entitled to an award of future medical care pursuant to Neb. Rev. Stat. [§] 48-120.
>
> (d) [Zoetis] to fee schedule the medical bills and reimburse [Boring's] mileage as reflect[ed] in Exhibit 2.

Exhibit 2 contains a summary of "causally related expenses from February 7, 2017, through the present" which the parties stipulated as follows: (1) expenses incurred totaled $74,817.02; (2)

unpaid medical expenses due totaled $489; (3) third-party subrogation interest due totaled $29,279.49; and (4) mileage/out-of-pocket expenses due totaled $8,809.57.

Prior to trial, Boring's counsel framed the trial dispute as one governing causation. Zoetis likewise argued the case was one governing a mild shoulder sprain, if anything at all, and not one involving a more serious shoulder injury which resulted in two surgeries. At trial, testimony was adduced from Boring and Danielle Griffin, a family nurse practitioner employed by Zoetis. Additional evidence received included Boring's medical records and a medical evaluation performed by Dr. Michael Morrison at the request of Zoetis regarding Boring's condition.

### (a) Martin Boring

By way of background, Boring testified he owns farmland where he performs some general maintenance including mowing road ditches and some spot spraying but that he has rented out the farm land for the past 15 years due to ongoing heart issues. Boring testified that his heart issues require doctor visits every 6 months to check his medication and blood work.

Boring testified that on February 7, 2017, he injured his right shoulder in a work-related accident while he was removing a gear box and motor. Boring then testified about the medical care he received for his injury and the interactions he had with various healthcare workers including a family nurse practitioner employed by Zoetis, Danielle Griffin; his family care doctors, Dr. George Hansen and Dr. Todd Johnson; and his surgeons, Dr. Patrick Hurlbut and Dr. Kirk Hutton.

Boring explained that on February 7, 2017, he informed the on-site nurse practitioner, Griffin, of the injury he sustained and that Griffin did not physically examine the injury but rather instructed Boring to ice the injury, take ibuprofen, and return if the injury did not improve. Boring testified that, between February 7 through 20, he had informed Griffin about three to six times that his injury was not improving, but she responded that he should continue to ice the injury and take ibuprofen.

Boring was asked why the first written history of his shoulder condition did not appear until February 20, 2017. In response, Boring testified that although he believed he first reported his injury to Griffin on February 7, 2017, he felt Griffin was not very proactive with his condition, which concern he then reported to his supervisor. Boring testified that his supervisor advised him to document the incident in an email to Griffin. Boring testified that it was only after he documented the incident that Griffin performed a physical exam on him which led to the first written record on February 20. Following the February 20 exam and a second exam by Griffin on March 10, Griffin requested that Boring undergo an MRI. On March 15, Griffin went over the MRI results with Boring and informed him that the results indicated he only suffered a strain which would eventually heal.

In the interim, Boring saw his new primary care physician, Dr. George Hansen, on February 10, 2017, as part of his routine 6-month exams during which he mentioned to his doctor that he was experiencing right shoulder pain. In Dr. Hansen's February 10 medical report, he noted that Boring was experiencing "an increasingly problematic right shoulder" and has:

> had right shoulder pain for quite some time, which he has simply lived with. He denies history of injury that he is aware of. More pain when reaching behind his back or over his head or when carrying things out to the side or in front of him. Does hurt to lay on his right side and is impacting his sleep somewhat.

Dr. Hansen also noted Boring experienced "tenderness to palpitation over the insertion of the rotator cuff anteriorly but Speeds and Yergason tests are negative. . . . Rotator cuff testing is consistent with pain on primarily supraspinatus and subscapularis testing including a liftoff test." Dr. Hansen further noted "[r]ight rotator cuff syndrome, likely without significant rotator cuff tear, new diagnosis. I would recommend proceeding with physical therapy initially followed by appropriate further evaluation if this is not helpful." Additionally, Dr. Hansen noted that Boring has intermittently used anti-inflammatories.

When asked whether Boring made the remarks to Hansen, Boring denied having shoulder problems prior to February 7, 2017. Later, during cross-examination, Boring did not deny telling Dr. Hansen that he was having "'right shoulder pain for quite some time, which [he] had simply lived with'" but explained that the timeframe would not have been longer than 3 days. Boring stated on cross-examination that he did not recall telling Dr. Hansen he denied any history of prior injury as suggested in Dr. Hansen's note which read "denie[d] history of injury that he is aware of." When asked about prior use of anti-inflammatories, Boring denied their use prior to his February 10, 2017, doctor appointment and explained that Dr. Hansen and his previous family care physician, Dr. Todd Johnson, were the only doctors who prescribed him medication. However, on cross-examination, Boring clarified that since the accident on February 7, he had been taking ibuprofen, which is an anti-inflammatory drug.

Boring continued to work after February 7, 2017, receiving assistance for tasks requiring heavy lifting but then quit working for Zoetis in September 2017 due to unrelated heart A-fibrillation problems. In December, Boring underwent an ablation for his heart problems leaving him bedridden for over a month, which led to his shoulder "stiffening up even more" to the point where he could not raise his arm. Boring discussed his shoulder problem with Dr. Hansen in March 2018, underwent an x ray, and was then referred to Dr. Hurlbut, an orthopedic surgeon.

Boring saw Dr. Hurlbut in April 2018 and discussed his shoulder problems. Boring testified that when Dr. Hurlbut viewed his March 2017 MRI image, he disagreed with the previously reported findings and opined that Boring needed surgery. Specifically, Dr. Hurlbut made a note in Boring's medical record that the 2017 MRI showed an articular sided tear of the supraspinatus and subscapularis, an inferior AC joint spur, and "the lateral edge of the acromion" and further noted concern about a SLAP tear. Dr. Hurlbut diagnosed Boring as having suffered a partial subscapularis tear, partial versus small full thickness tear of the supraspinatus, impingement syndrome including lateral edge spur, AC arthritis with inferior spurring, and superior labral tear from anterior to posterior (SLAP). Boring underwent surgery for his right shoulder in April 2018, and began physical therapy the day after surgery, which he continued for approximately 4 months.

In October 2018, Boring saw Dr. Hurlbut again and informed him that he was still unable to lift his arm above 90 degrees. Boring testified that Dr. Hurlbut wanted to perform a second surgery but Boring's insurance carrier indicated it would not cover the operation.

Boring testified he then saw surgeon Dr. Hutton to get another opinion about needing a second surgery. Boring testified that Dr. Hutton agreed that he needed a second surgery and Boring underwent surgery in February 2019. Despite the second surgery and additional physical therapy, Boring testified that he was discharged without meeting his goal of being back to 100 percent.

In December 2018 medical notes, Dr. Hutton recounted Boring's medical history explaining that Boring "had an MRI scan on March 13, 2017, which was read as mild supraspinatus

tendinosis without cuff tear with slight blunting of the free edge of the labrum without discreet acute labral tear. [Boring] was essentially told that the MRI was negative." Dr. Hutton continued that "[Boring] ultimately had an ablation for [his] atrial fibrillation and the heart was better and [Boring] started to refocus on his shoulder." Dr. Hutton then noted:

> [Boring] went to his primary physician who ultimately sent him to Dr. Hurlbut in Lincoln. Dr. Hurlbut saw [Boring] and asked him why they did not recommend surgery and ultimately performed surgery on him on April 18, 2018. He performed a right shoulder arthroscopic debridement of the glenohumeral joint with a limited lysis of adhesions/superior release of the inferior glenohumeral ligament, as well as debridement of some posterior adhesions, a superior labral repair, arthroscopic biceps tenodesis, and a subacromial decompression with coplaning of the distal clavicle. [Boring] then went to physical therapy, but said his shoulder never really improved. He never got this full range of motion back.

> Now he continues to have pain and inability to move his arm away from his body. [Boring] said Dr. Hurlbut recommended more surgery, but he wanted to get another opinion. [Boring] said that work comp originally denied his workmen's compensation claim and he says his health insurance at that time also denied it. He ultimately was forced to get an attorney and was referred here for further treatment. . . .

> **I suspect that [Boring]'s original problem does stem from the work related injury**. I feel that he probably sustained a partial cuff tear and developed adhesive capsulitis. I also think that surgery was probably necessary due to his work related injury, but I also feel that he has persistent adhesive capsulitis that needs to be addressed. I recommended that he proceed with a right shoulder arthroscopic lysis of adhesions.

(Emphasis supplied.)

As of July 1, 2019, Dr. Hutton determined in a functional capacity evaluation that Boring should have work restrictions limiting him to lifting 75 pounds and that work should be performed below shoulder level and within 18 inches of his body. Dr. Hutton also noted that Boring suffers a right upper extremity permanent impairment rating of 15 percent.

Boring testified that he wants to continue to work but would be unable to perform the type of work he previously performed because he can only perform work within 18 inches of his body and cannot do any overhead work, which is sometimes required at Zoetis. Boring testified that being employed is important to him because his wife plans on retiring soon which will leave him without health insurance. Boring further testified that he has not applied for work because he wants to participate in counseling to identify his best employment opportunities but has not yet spoken with any vocational counselors.

### (b) Danielle Griffin

Griffin, a nurse practitioner, testified that she first became aware of Boring's injury when he sent an email regarding the matter on February 20, 2017. Griffin examined Boring and noted he had full range of motion with no pain and he did not express any pain with palpitation or touching of the injury. Griffin treated Boring's injury with first aid care meaning she recommended ice, rest, and ibuprofen. Griffin testified that Boring returned on March 10 complaining of more

pain in the shoulder than previously experienced during the first visit. Griffin explained that she can prescribe certain medications, order MRIs, and make diagnoses. Griffin performed another assessment and identified pain in Boring's joint prompting Griffin to order an MRI at a facility unrelated to Zoetis. Once Griffin received the MRI results, she spoke with Boring who then informed her that he was doing better.

On cross-examination, Griffin testified that she does not file a report for workers' compensation unless she has to refer someone to a third party that would cause Zoetis' workers' compensation insurer to pay for the bill. Griffin explained that if she provides treatment in-house, first aid, or otherwise, she does not file a report with the workers' compensation court. Griffin testified that she did not have an orthopedic surgeon review the MRI but instead relied on a radiologist's reading of the MRI.

### (c) Additional Evidence

Zoetis' attorney requested that Boring be seen by Dr. Michael Morrison as part of a defense medical examination. In Dr. Morrison's May 2019 evaluation, he opined that Boring had "significant range of motion restricted with abduction and internal rotation," and that he has persistent adhesive capsulitis of his right shoulder 3 months after his second shoulder surgery. Dr. Morrison referenced Dr. Hansen's medical records to recount Boring's medical history related to his shoulder and stated "Boring had right shoulder pain for some time which he has learned to live with," that "there was no apparent injury to his right shoulder and no known mechanism of injury," and he had been taking anti-inflammatory medication for his shoulder. Dr. Morrison noted another concern which was that Boring did not receive medical treatment for 4 months from May 25 to September 11, 2017. Additionally, Dr. Morrison also noted that on March 29, 2018, Dr. Hansen's medical records indicated a possible injury in the fall of 2017.

Ultimately, Dr. Morrison concluded that "[f]rom these medical records, it is difficult to specifically relate a repetitive activity to [Boring's] right shoulder on February 7, 2017. In order to do that, further clarification of these records would have to be done which have been included in Dr. Hansen's medical records." Dr. Michael Morrison continued that concerning Boring's present status, "one would have to obtain the medical records in regards to the surgery done by Dr. Hutton. At the present time he is three months from that surgery, still having evidence of adhesive capsulitis of his right shoulder, attending physical therapy . . . three times a week."

### 2. TRIAL COURT'S ORDER

After the trial, the court issued an order finding Boring injured his right shoulder on February 7, 2017, in an accident arising out of and in the scope of his employment, as seen in the MRI taken in March 2017 that, when read correctly, showed the injury that led to surgery. The court explained that the surgery was performed to address the injuries shown on the MRI, which injuries were incurred from the February 7, 2017, accident. The court also attributed Boring's actions of continuing to work after the accident date, as being "a typical Nebraskan" who shows up for work and in pain. The court continued that the delay in treatment likely worsened Boring's injuries, who now suffers from a 15-percent loss of use of his right arm.

The court resolved the matter by awarding temporary and permanent benefits; payment for future medical care pursuant to Neb. Rev. Stat. § 48-120 (Cum. Supp. 2018); a vocational

rehabilitation evaluation and vocational rehabilitation services, if necessary; medical bills and mileage as reflected in the fee schedule outlined in exhibit 2; and penalties and attorney fees that would be determined later during a February 2020 telephonic hearing.

Concerning the temporary total benefits, the court determined that at the time of his injury, Boring's average weekly wage was $1,468.31 per week, and he is "entitled to $817.00 per week for temporary total benefits and for 33.75 weeks for 15 percent loss of use of the right arm." The court ordered the temporary benefits be paid from April 18, 2018, to July 1, 2019. Regarding the attorney fees and penalties, the court explained that while Zoetis argued attorney fees and penalties under Neb. Rev. Stat. § 48-125 (Cum. Supp. 2016) are not allowed because there is a reasonable controversy, the court disagreed finding Zoetis admitted in its answer that Boring "sustained a work accident and injuries to his right upper extremity arising out of and in the course of his employment."

The court continued by articulating:

An admission in a pleading is a judicial admission, a judicial admission is a substitute for evidence and dispenses with production of evidence by conceding for the purposes of litigation that the subject of the admission is true. See *Johns v. Carr*, 167 Neb. 545, 93 N.W.2d 831 (1958); *Nichols Media Consultants Inc. v. Ken Morehead Inv. Co.*, 1 Neb. App. 220, 491 N.W.2d 368 (1992); and *Anonymous v. Vanconcellos*, 15 Neb. App. 363, 727 N.W.2d 708 (2007). The judicial admission in [Zoetis'] Answer relieve[s] [Boring] from producing evidence on those items admitted. The admission is that [Boring] injured his right shoulder on February 7, 2017. This admission makes [Zoetis] liable for treatment and medical care of [Boring]'s right shoulder and the payment of weekly benefits under § 48-121. The payment of weekly benefits and permanent benefits when [Zoetis'] answer admits the accident and injury entitles [Boring] to a penalty and attorney's fees for nonpayment of medical expenses and nonpayment of weekly benefits.

A later hearing regarding attorney fees was held in February 2020, at which the court ultimately ordered Zoetis to pay $15,333 in attorney fees; $408.50 per week for payments due during the period from April 18, 2018, through July 1, 2019, and a $408.50 per week penalty for 33.75 weeks for late payment of permanent benefits; and medical bills and mileage in exhibit 2 pursuant to the fee schedule of the Nebraska Workers' Compensation Court.

Zoetis timely appeals from the court's order.

### III. ASSIGNMENTS OF ERROR

Zoetis contends the court erred as a matter of law in finding that (1) Boring's right shoulder injury arose out of and in the course of his employment with Zoetis, (2) Boring is entitled to temporary and permanent benefits, (3) Boring is entitled to payment and/or reimbursement for past and future medical expenses as well as mileage, (4) Boring is entitled to a vocational rehabilitation evaluation and services, and (5) awarding penalties and attorney fees with interest.

### IV. STANDARD OF REVIEW

Pursuant to Neb. Rev. Stat. § 48-185 (Cum. Supp. 2018), an appellate court may modify, reverse, or set aside a Workers' Compensation Court decision only when (1) the compensation

court acted without or in excess of its powers; (2) the judgment, order, or award was procured by fraud; (3) there is not sufficient competent evidence in the record to warrant the making of the order, judgment, or award; or (4) the findings of fact by the compensation court do not support the order or award. *Aboytes-Mosqueda v. LFA Inc.*, 306 Neb. 277, 944 N.W.2d 765 (2020).

On appellate review, the factual findings made by the trial judge of the Workers' Compensation Court have the effect of a jury verdict and will not be disturbed unless clearly wrong. *Id.* In testing the sufficiency of the evidence to support the findings of fact in a workers' compensation case, an appellate court considers the evidence in the light most favorable to the successful party, every controverted fact must be resolved in favor of the successful party, and the appellate court gives the successful party the benefit of every inference reasonably deducible from the evidence. *Id.*

As the trier of fact, the Workers' Compensation Court is the sole judge of the credibility of witnesses and the weight to be given their testimony. *Id.*

## V. ANALYSIS

### 1. WORK-RELATED INJURY

Zoetis first assigns that the court erred in finding that Boring's right shoulder injury arose out of the course and scope of his employment with Zoetis. In essence, Zoetis' first argument is that there was not sufficient evidence to find that the shoulder injury for which Boring eventually received surgeries in 2018 and 2019 arose out of and in the course of his employment.

In response, Boring first argues that, by admitting paragraph 3 in his petition which stated "[t]hat on or about February 7, 2017, in Lincoln, Lancaster County, Nebraska, [Boring] sustained a work accident and injuries to his right upper extremity arising out of and in the course of his employment with [Zoetis,]" that Zoetis is prohibited from challenging it now. In support of that proposition, Boring argues that Zoetis' admission to paragraph 3 of his complaint constitutes a "judicial admission," which constituted a waiver of that specific issue at trial and on appeal.

The Nebraska Supreme Court recently held in *Western Ethanol Co. v. Midwest Renewable Energy*, 305 Neb. 1, 17-18, 938 N.W.2d 329, 343-44 (2020):

> A judicial admission is a formal act done in the course of judicial proceedings which is a substitute for evidence, thereby waiving or dispensing with the production of evidence by conceding for the purpose of litigation that the proposition of fact alleged by the opponent is true. Similar to a stipulation, judicial admissions must be unequivocal, deliberate, and clear, and not the product of mistake or inadvertence. Additionally, an admission does not extend beyond the intendment of the admission as clearly disclosed by its context.

Although Zoetis' answer to paragraph 3 of Boring's petition makes clear that Zoetis admitted to some work-related accident and injury suffered by Boring on February 7, 2017, Zoetis' answer to paragraph 6 of the petition makes it equally clear that Zoetis disputed the nature and extent of that injury and the benefits attributable thereto. After reviewing the record, the clear thrust of Zoetis' position here is that although Boring may have suffered a minor strain on February 7, 2017, that injury eventually healed and Boring was treating for a different shoulder injury by 2018 which required two surgeries.

Although at one point Zoetis contended at trial that Boring may not have suffered any injury at all and that his shoulder problems may have predated the accident, the gravamen of its defense here is that Boring's injury on February 7, 2017, was, at best, a mild strain and did not support the stipulated benefits which were the result of a different injury. As stated by the Nebraska Supreme Court in *Western Ethanol Co.*, "an admission does not extend beyond the intendment of the admission as clearly disclosed by its context." 305 Neb. at 17-18, 938 N.W.2d at 344. Had the court found there was no injury here, this argument may have greater relevance. Having found that the 2018 and 2019 surgeries and his shoulder condition attended to in 2018 and 2019 did relate to the February 7, 2017, accident, we need not further analyze this contention. Because we find that Zoetis did not admit to the full extent of injury claimed by Boring in its petition and at trial, this argument fails.

This leads to Zoetis' second argument that the evidence does not support the award for Boring's shoulder condition treated in 2018 and in 2019. We disagree. As we stated in our standard of review, on appellate review, the factual findings made by the trial judge of the Workers' Compensation Court have the effect of a jury verdict and will not be disturbed unless clearly wrong. *Aboytes-Mosqueda v. LFA Inc.*, 306 Neb. 277, 944 N.W.2d 765 (2020). In testing the sufficiency of the evidence to support the findings of fact in a workers' compensation case, an appellate court considers the evidence in the light most favorable to the successful party, every controverted fact must be resolved in favor of the successful party, and the appellate court gives the successful party the benefit of every inference reasonably deducible from the evidence. *Id*. As the trier of fact, the Workers' Compensation Court is the sole judge of the credibility of witnesses and the weight to be given their testimony. *Id*.

Zoetis' argument here can basically be summarized by looking at Dr. Morrison's report. In that report, Dr. Morrison recites a chronology of events which he obtained from documents provided to him indicating that (1) Boring's injury was not reported until February 20, 2017; (2) Boring's report to Dr. Hansen on February 10, 2017, was that Boring was having shoulder pain "for some time" which he had learned to live with and that Boring denied any known mechanism of injury; (3) the March 2017 MRI "reveal[ed] mild tendinitis. No evidence of a cuff tear, labral abnormality and had a Type 1 acromion with no encroachment"; (4) by May 25, 2017, Boring was seen by Dr. Hansen and was advised he had rotator cuff syndrome; (5) Boring was next seen on September 11, 2017, at which time he indicated to Dr. Hansen that he would be retiring; (6) he began physical therapy on September 28, 2017; (7) following Boring's retirement, he had a "cardiac ablation" performed; (8) in March 2018, he again presented to Dr. Hansen for his shoulder and mentioned it related to an injury occurring in the fall of 2017 and only at this point was he recommended to see an orthopedic surgeon; (9) Boring then saw orthopedic surgeon Dr. Hurlbut on April 9, 2018, who believed Boring's March 2017 MRI revealed "artibular tears of the supraspinatus, subscapularis, impingement and a SLAP tear" and recommended surgery; (10) Dr. Hurlbut performed surgery on April 18 consisting of a "right shoulder arthroscopy for extensive debridement of the glenohumeral joint arthritis, acromioplasty, SLAP tear repair and a biceps tenodesis"; and (11) after followup consultations with Dr. Hurlbut relating to the surgery, Boring had a second operation performed by Dr. Hutton, which records were not available to Dr. Morrison.

Following this full recitation of the records reviewed by Dr. Morrison, he opined as it related to Boring's surgically repaired shoulder:

In regards to causation, there are some significant concerns with the medical records. On February 10, 2017[,] Dr. Hansen's medical records state that Mr. Boring had right shoulder pain for some time which he has learned to live with. Also, Dr. Hansen's records stated that there was no apparent injury to his right shoulder and no known mechanism of injury. He had also been taking anti-inflammatory medicine for his shoulder. Second concern is for four months [of] no treatment from May 25, 2017[,] to September 11, 2017. On March 29, 2018[,] Dr. Hansen's medical records show a possible injury in the fall of 2017. From these medical records, it is difficult to specifically relate a repetitive activity to his right shoulder on February 7, 2017. In order to do that, further clarification of these records would have to be done which have been (sic) included in Dr. Hansen's medical records.

Conversely, Boring offered evidence at trial in which he testified to first reporting the workplace injury to Griffin on February 7, 2017, and that the first written record of the incident was a product of Griffin not recording it until he issued a written request; that his statements to Dr. Hansen on February 10, 2017, were being taken out of context in that he never had shoulder problems prior to February 7, 2017, and he did relate his shoulder injury to the February 7, 2017, incident at work; that Dr. Hurlbut refuted the March MRI report and opined it did show evidence of objective injury which he surgically repaired; that he remained symptomatic with worsening conditions from February 7, 2017; and that Dr. Hulbert and Dr. Hutton linked his shoulder conditions for which he received two surgeries to the February 2017 workplace incident.

We find that after reviewing the record we summarized above, when considering the evidence in a light most favorable to Boring, the successful party in this litigation, the evidence was sufficient for the court to find that the injury for which Boring ultimately received two surgeries and for which he obtained maximum medical improvement on July 1, 2019, arose out of and in the course of Boring's employment. Although Dr. Morrison presents evidence which would support his opinion that Boring's treatment and recitation history makes it difficult for him to relate the surgeries and Boring's current condition to the February 7, 2017, incident, his opinion simply represents a disagreement with Drs. Hurlbut and Hutton which take a different view. Those factual discrepancies and credibility issues in this record were resolved in favor of Boring by the court which is the sole judge of the credibility of witnesses and the weight to be given their testimony. Because there is sufficient competent evidence in the record to warrant the making of this finding by the court, the first assignment of error fails.

## 2. FINDINGS GOVERNING TEMPORARY AND PERMANENT BENEFITS, MEDICAL EXPENSES, AND MILEAGE

Zoetis next argues in assignments of error two and three that because the court erred in finding that Boring's injury arose out of the course and scope of his employment, it erred in awarding temporary and permanent benefits, medical expenses, and mileage to Boring as the evidence is not sufficient to support those awards.

But we can quickly dispense with these assigned errors. Here, Boring and Zoetis stipulated in Exhibit 1 that "[s]hould the Court find [Boring] suffered a compensable accident and injury,

[Boring] would be entitled to an Award as follows" and then stipulated to the exact temporary and permanent benefits, medical bills, and mileage which the court should award.

Because we found in the previous section of this opinion that the record supports the finding by the court that the injury for which Boring treated through July 1, 2019, arose out of and in the course of his employment, the court did not err in awarding the benefits as stipulated by the parties. Thus, assignments of error two and three fail.

### 3. VOCATIONAL REHABILITATION EVALUATION AND SERVICES

Zoetis next contends that the court erred in awarding a vocational rehabilitation evaluation and services, if necessary, because Boring had not attempted to apply for jobs after retiring from Zoetis due to his heart condition and had already received sufficient training as evidenced by Boring's two associate degrees in HVAC/R and diesel technology.

In Nebraska, vocational rehabilitation may be awarded:

> When as a result of the injury an employee is unable to perform suitable work for which he or she has previous training or experience, he or she is entitled to such vocational rehabilitation services, including job placement and training, as may be reasonably necessary to restore him or her to suitable employment.

Neb. Rev. Stat. § 48-162.01(3) (Reissue 2010). For purposes of vocational rehabilitation, "suitable employment" is employment which is compatible with the employee's preinjury occupation, age, education, and aptitude. *Anderson v. EMCOR Group*, 298 Neb. 174, 903 N.W.2d 29 (2017).

Here, concerning vocational rehabilitation, the court found that "[Boring] is unable to return to his prior job with [Zoetis] for which he received a substantial weekly wage" and ordered an evaluation for vocational rehabilitation, with services if necessary. While the court's factual findings were not extensive, we cannot say those findings were clearly wrong or that there was not sufficient evidence to support this order. First, the record indicates Boring is unable to perform his previous job with Zoetis. Dr. Hutton provided a functional capacity evaluation stating that Boring had a permanent lifting and carrying restriction limiting him to lifting 75 pounds and work performed below shoulder level within 18 inches of his body. Boring testified that he could not return to Zoetis and perform the work required of his previous position because he cannot engage in overhead work or work requiring him to reach away from his body, which was part of his job. Second, while Boring retired from Zoetis due to his poor heart health which kept him from working for a period of time, there was evidence that, following his surgery, his heart-related medical condition had stabilized. Further, Boring testified to his desire to begin working again now that his heart condition had stabilized. Third, the court only ordered a rehabilitation evaluation in order to determine whether further services were warranted. The purpose of a functional capacity evaluation is to determine if vocational retraining is necessary and appropriate. See *Moyera v. Quality Pork Internat.*, 284 Neb. 963, 825 N.W.2d 409 (2013), and *Visoso v. Cargill Meat Solutions*, 285 Neb. 272, 826 N.W.2d 845 (2013) (court cannot order vocational retraining without determining employee's post-injury physical restrictions and vocational impediments prevent employee from complying with all lower work priorities in § 48-162.01(3)). Based on Boring's pre-injury occupation, his age, his education in HVAC/R and diesel technology, his entire employment history consisting of only a few employers, one being Fleming Foods and the other

being Pfizer which later became known as Zoetis, the stabilizing of his heart-related medical condition and his prior work-related obligations which required Boring to maintain and lift heavy objects, we agree with the court that an evaluation for vocational rehabilitation is warranted in order to determine whether vocational rehabilitation services are necessary and appropriate. Thus, this assignment of error fails.

### 4. PENALTIES AND ATTORNEY FEES

Zoetis finally argues the court erred in awarding Boring penalties and attorney fees because an employer is not liable for penalties and attorney fees if a reasonable controversy exists regarding employer liability for the employee's injury.

In Nebraska, pursuant to § 48-125:

an employer must pay a 50-percent waiting-time penalty if (1) the employer fails to pay compensation within 30 days of the employee's notice of disability and (2) no reasonable controversy existed regarding the employee's claim for benefits. When compensation is so delayed and the employee receives an award from the compensation court, the employee is also entitled to attorney fees and interest. Although "reasonable controversy" appears nowhere in the text of § 48-125, the phrase has been part of our waiting-time penalty jurisprudence for more than 90 years.

*Armstrong v. State*, 290 Neb. 205, 215, 859 N.W.2d 541, 550 (2015).

The Nebraska Supreme Court has discussed the concept of "reasonable controversy," explaining:

Under the test we announced in *Mendoza v. Omaha Meat Processors*, 225 Neb. 771, 408 N.W.2d 280 (1987), for the purpose of § 48-125, a reasonable controversy exists if (1) there is a question of law previously unanswered by the Supreme Court, which question must be answered to determine a right or liability for disposition of a claim under the Nebraska Workers' Compensation Act, or (2) if the properly adduced evidence would support reasonable but opposite conclusions by the compensation court about an aspect of an employee's claim, which conclusions affect allowance or rejection of an employee's claim, in whole or in part. Whether a reasonable controversy exists under § 48-125 is a question of fact.

We have explained that "[u]nder the *Mendoza* test, when there is some conflict in the medical testimony adduced at trial, reasonable but opposite conclusions could be reached by the compensation court." And we have held that a reasonable controversy existed even though the evidence showing the controversy was unknown at the time the employer refused benefits. In *Dawes v. Wittrock Sandblasting & Painting*, [266 Neb. 526, 667 N.W.2d 167 (2003), disapproved in part on other grounds, *Kimminau v. Uribe Refuse Serv.*, 270 Neb. 682, 707 N.W.2d 229 (2005)] the claimant argued that the compensation court erred by not awarding him a waiting-time penalty. We disagreed: "Here, [the employer] presented expert medical testimony that would have supported a finding that [the claimant's] condition was not the result of an accident arising out of and in the course of employment. . . . While this opinion was not adduced until after the denial of benefits, it is evidence that [the employer] had an actual basis in law or fact for denying [the

- 12 -

claimant's] claim." So, we concluded that a reasonable controversy existed based on testimony unknown at the time the employer denied benefits.

*Armstrong v. State*, 290 Neb. at 216-17, 859 N.W.2d at 550-51.

Here, the court noted in its order that no controversy existed because Zoetis admitted liability in its answer, which the court determined was a judicial admission. Because the court determined there was no controversy, it awarded penalties and attorney fees for Boring ordering Zoetis to pay $15,333 in attorney fees and $408.50 per week for payments due during the period from April 18, 2018, through July 1, 2019, and a $408.50 per week penalty for 33.75 weeks for late payment of permanent benefits. However, as we determined earlier in this opinion, although Zoetis did admit in its answer that Boring sustained an injury on February 7, 2017, arising out of and in the course of his employment, it most certainly denied the nature and extent of Boring's injuries and the case was tried primarily on the issue of causation. Having determined that Zoetis did not judicially admit the nature and extent of Boring's injuries here, we must separately determine if a reasonable controversy existed as to the nature and extent of Boring's injures as contested by Zoetis.

Here, there was evidence in this record that would support reasonable but opposite conclusions by the Workers' Compensation Court regarding the nature and extent of Boring's February 7, 2017, injury. That evidence was well-articulated by Dr. Morrison in his report which we summarized previously which included indications of late reporting, inconsistent treatment or inconsistent reading of the March 2017 MRI, and possible reference to a separate injury in the fall of 2017. Based upon his review, Dr. Morrison opined he would have a difficult time trying to link Boring's condition as of 2018, for which Boring received two surgeries, to the February 7, 2017, workplace accident. And although there is sufficient evidence which supported the compensation court's findings here, we cannot say there was no reasonable controversy which justified a waiting time penalty or attorney fees. Thus, we hold the court erred in awarding a waiting-time penalty and attorney fees. Accordingly, we reverse and vacate that portion of the award granting Boring a waiting-time penalty and attorney fees.

## VI. CONCLUSION

In sum, except for the portions of the court's award relating to penalties and attorney fees, the findings of the court are supported by competent evidence and affirmed. However, having found that a reasonable controversy existed as to the nature and extent of Boring's injuries as contested by Zoetis, the portions of the court's award relating to penalties and attorney fees are reversed and vacated.

AFFIRMED IN PART, AND IN PART REVERSED AND VACATED.